Whaley, Gldef Justice,
delivered the opinion of the court: The several Acts of Congress under which this suit is brought and jurisdiction given to entertain it are set forth in Finding No. 1. Amended petitions have been filed and issue joined by general traverse.
The claims sued on here are solely those of the Chickasaw Nation. The Jurisdictional Act, 43 Stat. 537, June 7,1924, covers “any and all legal and equitable claims arising under or growing out of any treaty or agreement between the United States and the Choctaw and Chickasaw Indian Nations or Tribes, or either of them, or arising under or growing out of any Act of Congress in relation to Indian affairs which said Choctaw and Chickasaw Nations or Tribes may have against the United States, which claims have not heretofore been determined and adjudicated on their merits by the Court of Claims or the Supreme Court of the United States.”
The act waives the lapse of time and statutes of limitation.
The claims will be discussed in the order in which they appear in the special findings of fact.
With the exception of a short deposition the parties rely entirely on defendant’s accounting, the results of which have been filed in the case, and the parties are bound thereby. The reports so filed constitute for all practical purposes the sole source of information. '
The first claim, is stated in the petition at $114,487.96, which plaintiff now reduces to $63,222.19. It arises under a presumed treaty or agreement of July 15,1794. This treaty or agreement is not in evidence and neither the original nor copy thereof can be located. Its existence is evidenced only by a reference thereto in various appropriation acts and in them it appears sometimes as an “agreement,” other times as a “treaty.” By these various appropriations it appears that the obligation the Government assumed was the payment to the plaintiff of an annuity of $3,000 in goods.
*35 Appropriations of $3,000 per year were made by Congress until by the Act of March 3, 1901, 31 Stat. 1058, 1062, this annuity was funded at $60,000.
Without knowledge of the terms of the treaty or agreement, it may not be said that Congress violated them by making no appropriations sooner than it did. Hence, the claim of $10,500 for the last half of the year 1194 and for the years 1795,1796, and 1797 is without support and cannot be allowed.
After Congress did begin appropriating to fulfill the treaty or agreement, the appropriations were without lapse.
The treaty or agreement was recognized by the Congress only insofar as appropriations were made, and it is to be given limited effect accordingly. Eecognition by the Court is proper notwithstanding lack of proof as to ratification. See Moore v. United States et al., 32 C. Cls. 593.
For the years 1798, 1799, and 1800 goods of the annuity values were forwarded from the War Department storehouse in Philadelphia for the Chickasaw Nation. It must be presumed that they were received in due course. To require the defendant to prove affirmatively that the goods were received (the proof at this late date would have to be documentary) would place an impossible burden where it does not rightfully belong. The burden is upon the plaintiff to prove its case. While the jurisdictional act waives the “lapse of time,” it does not thereby shift the burden of proof to the defendant, nor does the jurisdictional act by its terms ■excuse the absence of proof by the plaintiff.
It must also be presumed that the goods forwarded were paid for out of the appropriations made in fulfillment of the supposed treaty or agreement. The Government’s accounts are not complete in that respect, but it may not be assumed that the Government paid for the goods without appropriation. Counsel do not invite attention to any other appropriations.
For the years 1801,1802,1803, and 1804 the records disclose purchase by the defendant of annuity goods for various tribes, including the plaintiff, but do not show how much was allocated to the plaintiff. Unless this allocation is known, the *36 shortage, if any, in the goods annuity of $3,000 cannot be ascertained. The accounts show no shortage for which judgment may be given.
For the period 1805 to 1811, inclusive, the same remarks are applicable as for the period 1798 to 1800, inclusive, and there can be no recovery.
By the treaty of October 19,1818, 7 Stat. 192,194, pending goods annuities were to be paid in cash.
For the period 1812 to 1852 inclusive, the accounts show a balance unexpended from appropriations amounting to $4,446.05 which plaintiff is entitled to recover. As shown by Finding No. 4, an additional item of $3,000 was unexpended for that period, but it was carried forward in the accounts until finally expended for refugee Indians, as explained in Finding No. 8. Having been finally expended, the validity of the expenditure — that is, for the benefit of refugee Indians— will be discussed under the question of expenditures for refugee Indians.
The second claim is for an unexpended balance of $2,000 under a treaty obligation of September 20, 1816, the obligation having been duly appropriated for. Recovery is due in the sum of $2,000.
The third claim, is for $1,000. Finding No. 6 shows it to be an unexpended balance of a treaty obligation of October 19,1818, duly appropriated for. Recovery is due in the sum of $1,000.
The fourth claim is for a shortage of $3,859.42 in disbursement for the education of children of the tribe, pursuant to the treaty of May 24,1834 (Finding No. 7). The treaty obligation of $45,000 was duly appropriated by Congress, but the children to be educated were to be selected and recommended by a designated set of seven persons. More children could not be educated than were selected and recommended, and since, as the findings state, there is no evidence as to selection and recommendation, it does not appear that the treaty obligation was unfulfilled. It was not a bare cash annuity without a defined application. The object was apparently attained, the expense of educating selected and recommended children duly met, and there can be no recovery.
*37 The -fifth claim (Finding No. 8) is the “refugee” claim. The Act of July 5,1862, appropriated $3,000 “For permanent annuity in goods, per act of twenty-fifth February, seventeen hundred and ninety-nine.” But in this Act was a general proviso (it is quoted at length in the findings) for the suspension of appropriations for those Indians in hostility against the United States, including the Chickasaws and other named tribes, “at and during the discretion and pleasure of the President,” and the Act further provided that the President might expend appropriations already made and unex-pended, to relieve individual members of the tribes driven from their homes and reduced to want because of their friendship to the Government. There were similar succeeding acts of Congress, the Secretary of the Interior being substituted for the President.
The Act of July 5, 1862, further authorized the President to proclaim treaties with the hostile tribes abrogated, but no such proclamation appears to have been promulgated.
The Act of July 5, 1862, was perhaps peculiar in its language, in that it permitted that “appropriations * * * be suspended * * * at * * * the discretion * * * of the President.” But what the Act did that is of particular concern here was to authorize the President to expend treaty appropriations for the benefit of individual refugees.
To suspend or postpone annuities is very different from accumulating them. To resume annuities at the end of a period of suspension does not include the payment of back annuities. Annuities are annual allowances. Moreover, the Act of July 5, 1862, and succeeding acts did not require that annuity appropriations for hostile Chickasaws should be available only for Chickasaw refugees, Choctaws for Choctaws, Cherokees for Cherokees. The appropriations were of Government monies, not of tribal funds, and the self-evident purpose of the Act of July 5, 1862, was to suspend the payment of annual treaty obligations, the money thus set free to be available for refugees, who might in the very nature of the situation be scattered and impractical of segregation into tribes for the purpose of general and immediate relief, and individual accounting.
*38 The Act of July 5, 1862, permitted expenditure for the benefit of refugee Indians of moneys already appropriated to satisfy treaty obligations, but not yet expended. The item of $3,000 referred to in Finding No. 4 as carried forward from year to year comes within this class of unexpended funds. This item, added to the annuities for the five fiscal years 1862 to 1866 under the treaty or agreement of July 15, 1794, which comes into the picture only by reference to it in acts of Congress, gives a sum of $18,000, as explained in Finding No. 8. There was available also a fund amounting to $219,-384.09 from sales of land and income from investments, accumulated under the treaty of May 24, 1834, a total of $237,384.09. And this total of $237,384.09 was distributed to refugee Indians. The accounts do show that Chickasaw refugees received some benefit from these disbursements, but how much the accounts do not disclose.
Doubt was expressed in Seminole Nation v. United States, 93 C. Cls. 500, 516, whether expenditure of funds under the Act of July 5, 1862, for refugees of tribes other than those belonging to the tribe whose funds they were, was authorized. How much in the instant case was expended for the benefit of Chickasaw refugees we do not know. Were it now held definitely that funds of one tribe should not have been expended for the benefit of refugees of another tribe, we would still be unable to ascertain the amount of judgment to be given. For the Chickasaw refugees have received some benefit from the distribution, and it was held in the Seminole case that a distribution was authorized by the Act of July 5, 1862. Recovery, if any, could be had only of the balance, and that balance is unknown.
There can be no recovery on this claim.
The sixth claim is for $42,586.11, said to have been disbursed from Chickasaw funds over and above one-fourth of the total expense of the salaries paid to mining trustees of coal deposits jointly owned by the Choctaw and Chickasaw nations. As will be seen by the legislation and agreements set forth in Finding No. 9, there were originally two trustees for the mining properties, one a Choctaw, the other a Chickasaw, their salaries to “be fixed and paid by their respective nations.” This arrangement continued down to the appro *39 priation act of June 5, 1924, 43 Stat. 390, when one mining trustee only was provided for, for the two nations. Plaintiff would have it that the apportionment of one-fourth of the expense to the Chickasaws and three-fourths to the Choctaws should have obtained while there were two trustees, a trustee of each nation. The effect of this would be to impose upon the Choctaws one-half the salary of the Chickasaw trustee, provided the trustees had the same salaries.
For the 25-year period involved in Finding No. 9, however, the salaries were not the same. The Choctaw trustee was paid $72,288.74, the Chickasaw trustee $80,461.42, a total of $152,-750.16. One-fourth of this total is $38,187.54. Under the apportionment claimed by the plaintiff — that is, one-fourth to the Chickasaws, three-fourths to the Choctaws — the Chickasaw trustee’s salary of $80,461.42 would be paid $38,187.54 by the Chickasaws themselves and $42,273.88 by the Choctaws. In other words, for representing the Chickasaw interests the Chickasaw trustee would be paid the greater part of his salary by the Choctaws.
But the Atoka agreement, 30 Stat. 495,505, 510, specifically provided that the trustees’ salaries should “be fixed and paid by their respective nations.”
Down to the appropriation Act of June 5,1924, providing for one mining trustee only, there appears to have been sufficient tribal existence and tribal government to fix the trustees’ salaries, and the court finds that as a matter of fact for the entire 25-fiscal-year period, 1900 to 1924, the mining trustees were paid on warrants issued by the tribal nations.
During the period in which there was one trustee only the proper apportionment of expense is conceded to be one-fourth to the Chickasaws, three-fourths to the Choctaws. On this basis the plaintiff is entitled to recover $312.23.
The seventh claim is covered by Finding No. 10. The Act of April 26, 1906, prevented the Secretary of the Interior from expending from Chickasaw funds for school systems more in any one year than “the amount expended for the scholastic year ending June thirtieth, nineteen hundred and five.”
Plaintiff says that “during” the scholastic year 1905 an amount of $20,871.88 only was disbursed for schools. But *40 the statute expresses the maximum differently. It says expended “for” (not “during”) the scholastic year 1905.
Expenses for the Chickasaw schools were met by tribal warrants. It is apparent from the findings that tribal warrants issued for school purposes in 1905 were not at once presented for payment, but if so presented were not paid until 1906. The amount paid on these warrants, issued for educational purposes in 1905, amounted to $155,552.19.
There is no proof of expenditure from Chickasaw funds in the United States Treasury for any one year, to the end of the fiscal year 1929, of any amount exceeding $155,552.19. Consequently there can be no recovery.
The eighth claim is for expenditures from tribal funds made without specific appropriation by Congress, in violation of Section 18 of the Act of August 24,1912, 37 Stat. 518, 531. Such unlawful expenditures were made, and they are listed item by item in Finding No. 11. As to items other than $671.64 for “Miscellaneous agency expenses including employees”, they would be recoverable except that on their face they would be gratuities for the benefit of the plaintiff if expended from funds of the United States and not from tribal funds. To give plaintiff judgment for them would result in expenditure from funds of the United States of gratuities for the plaintiff’s benefit.
Section 2 of the Act of August 12,1935, 49 Stat. 571, 596, provides:
In all suits now pending in the Court of Claims by an Indian tribe or band which have not been tried or submitted, and in any suit hereafter filed in the Court of Claims by any such tribe or band, the Court of Claims is hereby directed to consider and to offset against any amount found due the said tribe or band all sums expended gratuitously by the United States for the benefit of the said tribe or band; and in all cases now pending or hereafter filed in the Court of Claims in which an Indian tribe or band is party plaintiff, wherein the duty of the court is merely to report its findings of fact and conclusions to Congress, the said Court of Claims is hereby directed to include in its report a statement of the amount of money which has been expended by the United States gratuitously for the benefit of the said tribe or band: Provided, That expenditures made prior to the date of law, treaty, or Executive order under *41 which the claims arise shall not be offset against the claims or claim asserted; and expenditures under the Act of June 18, 1934 (48 Stat. L. 984), except expenditures under appropriations made pursuant to section 5 of such Act, shall not be charged as offsets against any claim on behalf of an Indian tribe or tribes now pending in the Court of Claims or hereafter filed: Provided further, That funds appropriated and expended from tribal funds shall not be construed as gratuities; and this section shall not be deemed to amend or affect the various Acts granting jurisdiction to the Court of Claims to hear and determine the claims listed on page 678 of the hearings before the subcommittee of the House Committee on Appropriations on the second deficiency appropriation bill for the fiscal year 1935: And provided further, That no expenditure under any emergency appropriation or allotment made subsequently to March 4, 1933, and generally applicable throughout the United States for relief in stricken agricultural areas, relief from distress caused by unemployment and conditions resulting therefrom, the prosecution of public works and public projects for the relief of unemployment or to increase employment, and for work relief (including the civil works program) shall be considered in connection with the operation of this section.
It was held in effect in Choctaw Nation v. United States, 91 C. Cls. 320,371, that expenditures in the way of beneficial gratuities, derived through a judgment, were improper under the act of August 12, 1935. It follows that plaintiff is not entitled to judgment for the difference of $3,823.23 even though expended from tribal funds without appropriation by Congress. The item of $671.64 would not be a gratuity, and it is therefore recoverable.
The ninth claim is for certain balances of the plaintiff alleged to have been advanced to disbursing officers, but not expended or accounted for. Finding No. 12 describes them. On this claim plaintiff is entitled to recover $9,517.61, made up of $8,257.63 and $1,259.98.
The tenth claim is based on recorded defalcation of a disbursing agent. The accounts bear an entry of $31,568.21 stated as “Shortage in the accounts of it. D. C. Collins— $31,568.21.” But when Congress came to appropriate money to cover the shortage only $24,982.29 was appropriated as principal, and that amount was restored to the fund.
*42 In the absence of proof of the amount of the defalcation, aside from the entry of $31,568.21, it cannot be said that Congress appropriated less than the net actual loss. We have the judgment of Congress against an accounting entry, and no recovery can be had. Nor can it be said that the substantial interest allowed, $20,610.39, was a gratuity. Interest was justly due and defendant may not recover it as gratuity.
The eleventh, claim covers several items that plaintiff describes as “Unauthorized transfers of Chickasaw funds to funds of other tribes.” These items are set forth in Finding No. 14.
The finding states the absence of proof and this lack precludes recovery. The items were adjustments in the accounts. To readjust them requires more information than the accounting affords. Presumably there was reason for making the adjustments and at this time to readjust the accounting might conceivably reintroduce errors that the adjustments were designed to correct.
No recovery can be had on these items.
The twelfth, claim the plaintiff entitles “Unauthorized deposit of Chickasaw moneys to funds of other tribes.” The items are listed in Finding No. 15.
These claims have the defect of those in the preceding finding. There is lack of proof that the deposits were erroneously made. The mere fact of deposit to other than a Chickasaw fund, without more, does not entitle plaintiff to recover. It is quite evident that the accounting of funds was a major proposition. Under such circumstances numerous corrections, adjustments, transfers were necessary. It would be altogether exceptional if they were not necessary. No judgment of recovery can be based on the showing made.
The thirteenth claim is described in Finding No. 16. It is an item of $5,156.00 interest on bank deposits indicated in the accounts as accruing on Chickasaw funds, but transferred and redeposited in the United States Treasury in three several amounts as interest on Cherokee, Choctaw, and Creek bank deposits. They represent collections jointly for the Choctaw and Chickasaw Nations. The assignment to the Cherokees, Choctaws, and Creeks was an administrative ad *43 justment, as to which there is no proof of impropriety or incorrectness. The claim may not be allowed.
The fourteenth claim is for alleged illegal disbursements from Chickasaw funds for exchange fees. There is no question that Congress did not authorize the disbursement; the defendant concedes that; but to recover the fees now would constitute a gratuity under the Act of August 12,1935, 49 Stat. 571, 596. Transmittal of the funds to the TJ. S. Treasury was an incident of their collection, which was being done for the plaintiff’s benefit by the Government’s fiscal officers. There can be no recovery, therefore, on this item.
The -fifteenth claim is, as the plaintiff states it, “illegal disbursements of Chickasaw funds made by defendant for other tribes.” The facts relative thereto are set forth in Finding No. 18.
In the voluminous accounting of Indian funds there were necessarily many adjustments and redistributions. In none of the items described in this finding is there proof of error in redistribution, and we may not assume that such an error existed, where the action taken appears as an adjustment, or readjustment. The plaintiff is not entitled to recover on this claim.
The sixteenth claim, as plaintiff styles it, is “Errors of defendant in failing to credit Chickasaw funds with Chickasaw moneys.” The plaintiff is entitled to recover on this claim, in its entirety, consisting of three items, (a) $480.73, (b) $3,700.00, (c) $609.00, a total of $4,789.73. The first item, $480.73, is a manifest error in bookkeeping. The two other items are errors by the disbursing agent at the Union Agency, in the taking up of Chickasaw funds, and are allowable items.
The seventeenth claim is entitled “Chickasaw moneys erroneously returned to surplus by defendant.” Two items of this claim, (a) $100.00 and (c) $21.52, were transferred or returned to surplus in error and are recoverable in the total amount of $121.52. The second item (b) was properly returned to surplus and may not be recovered. It was part of an appropriation to pay commissioners for service rendered, and the plaintiff here is not entitled to receive their pay, if in fact they were underpaid.
*44 The eighteenth and last claim of the plaintiff is for interest on enumerated items, being for the major part items for allegedly excess annual expenditures of Indian funds on schools. See Finding No. 10, which is plaintiff’s seventh claim, described above, no part of which is allowed. The principal not being recoverable, the claim for interest also falls.
Interest is also claimed on the two items of $93.15 and $25.00, which will be found in Finding No. 11 herein. The items of principal not being recoverable, interest also is not recoverable.
The remainder of the case is confined to defendant’s claim of offsets. This claim is covered by Finding No. 21 and consists of several items. None of them is an allowable item. They are all transfers, without any proven error. In fact two of them are merely transfers from one Chickasaw fund to another.
As has already been indicated, no readjustment is proper where the adjustment is not shown to be erroneous. To make another adjustment might well result in nullifying the correction of an error.
The special findings made are far more elaborate than requested by either side. A thorough investigation has been made in matters of accounting, with results that are, in many instances, contrary to the requests made. The findings requested by either party have not been in satisfactory detail.
Plaintiff is entitled to recover on items and in amounts as follows:
Finding: Amount
4 (c) _ $4,446. 05
5-2,000.00
6-1, 000. 00
9_ 312.23
11_ 671. 64
12 (a) 8,257.63
12 (b) 1,259.98
19 (a) 480. 73
19 (b) 3,700.00
19 (e) 609.00
20 (a) 100.00
20 (c) . 21.52
Total. 22,858.78
*45 There remains the matter of gratuities, if any, under the Act of August 12, 1935, to be offset against the sum of $22,858.78 recoverable by the plaintiff.
The gratuities found in Chickasaw Nation v. The United States and Choctaw Nation, case No. K-334, decided this day, post, page 45, amount to $69,820.39, but are not used in that case and are therefore available in their entirety for offset in the instant case. They are so applied to the extent of $22,-858:78, and the balance is available for future application.
The petition must be and is dismissed. It is so ordered.
Madden, Judge; WhitakeR, Judge; and Littleton, Judge, concur.
Jones, Judge, took no part in the decision of this case.